[No. 2280.]

## W. O. TOW v. THE STATE.

1. MURDER—EVIDENCE.—In a murder trial, a State's witness who was shown to have been an active participant in the transaction which resulted in the killing of the deceased, having testified to material facts, the defense proposed to prove that, about two hours before the homicide, the said witness said that she directed the deceased to load a shot gun and kill the defendant if he entered upon the premises, which proposed evidence was rejected by the trial court. *Held*, error; and that the evidence was competent both to prove the animus of the witness, and, in view of the other evidence in the case, as also material upon the question of the defendant's guilt. See the opinion *in extenso* on the question.

2. SAME—MANSLAUGHTER—CHARGE OF THE COURT.—See the statement of the case for evidence *held* to demand of the trial court a charge upon the law of manslaughter.

APPEAL from the District Court of Llano. Tried below before the Hon. A. W. Moursund.

Under an indictment which charged him with the murder of James Cox, in Llano county, Texas, on the twenty-fifth day of

February, 1886, the appellant was convicted of murder in the second degree, and awarded a term of five years in the State penitentiary.

Mrs. F. M. Cowan, the mother of the deceased, was the first witness for the State. She testified that she was at her home in Llano county, Texas, on the night of December, 25, 1885. She was quite unwell, and her daughter, Mrs. Garrett, was sitting up with her. Between ten and eleven o'clock the defendant, who was her son in law, having married her other daughter, came to the house, bringing his Winchester rifle with him. He appeared to be greatly excited, and, in the presence of the witness, her two sons, James Cox, (the deceased) and W. L. Cox, and of Mrs. Garrett, spoke of his wife in very abusive terms, using extremely vulgar and obscene language and accusing her of an unlawful intimacy with J. V. Garrett, Mrs. Garrett's husband, and also witness's son in law. Witness asked him how he had ascertained the criminal relations between his wife and Garrett. He replied that he had choked his wife and made her confess. Mrs. Garrett denied indignantly that her husband had been guilty of unlawful intimacy with her sister, the defendant's wife. Defendant persisted in his charge and abuse of his wife, and said that he was going to drive her away from his house, and as she had no where to go he was going to bring her things to witness's house. Witness replied that it devolved upon the defendant to prove his wife's guilt, and that, if he did prove it, neither his wife nor children should come on her premises. Defendant persisted in his threat to drive his wife away from his house, and as it was cold, bad weather, witness consented to receive her for the time being. Defendant left about midnight, and just before day on the next morning he came back with his wife, the latter carrying her baby, and the defendant his gun. The defendant left immediately, going in the direction of his house, about three quarters of a mile distant. His wife, when spoken to by witness about defendant's charge against her, said that her confession of intimacy with Garrett was forced from her by the violence and threats of the defendant, and that it was totally untrue—that she had never been criminally intimate with Garrett. Defendant allowed his wife to bring only her nursing child with her, and told her she could keep it only until it was weaned, and that mean while he would keep the other five.

On the Sunday following the occurrence recited, the defendant came to witness's house and had a private coversation with his

wife. It resulted in Mrs. Tow going home with her husband, the witness telling her then never to enter her house again; that she had no wish ever to see her or her children again, and that she did not want any of them to see her when she was dead. The witness afterwards, by Alonzo Cowan and others, sent defendant word never to put his foot on her premises. One evening in February, a day or two previous to the twenty-fifth day of that month, Mrs. Tow came again to witness's house, this time bringing none of her children, and said that defendant had again charged her with infidelity and criminal relations with Garrett, and had driven her off. On the evening of February 25, witness, her two sons and defendant's wife were sitting before the fire on the west side of the room, when the defendant, having his gun in his hand, stepped in the door at the south end of the room and said: "Good evening." Witness told him not to come inside of the room, and ordered him to leave her premises. Witness repeated her orders two or three times, and finally caught up a shot gun and advanced upon him. Defendant backed off towards the wood pile. Witness set the gun down and followed him, repeating her orders for him to get off of her premises. When defendant reached a point near the wood pile, he raised the gun, pointed the muzzle towards the witness, waved it sideways and told witness to keep back; that she could not scare him. Witness then took up an axe, held it in a striking position, being at the time about six steps distant from defendant, and again ordered him to leave. When defendant reached a point about twelve steps beyond the wood pile, still holding his gun towards the witness and waving it, a gun fired behind the witness ; the defendant squatted, straightened up and fired. Defendant fired his gun from his breast and not from his shoulder. But two or three seconds intervened between the shots. As the report of defendant's gun died away, deceased called out : "He has broken my leg," and witness exclaimed : "Come on ! War has begun ! Stand by me, and we'll fight it out if we all have to die !"

The defendant, covering his retreat behind some brush in low ground, walked off rapidly towards the house of Mr. Lewis Crain, which was about a quarter of a mile distant from witness's house. Witness went back to her house and found her son James lying in front of the door, shot through one leg above the knee, and bleeding profusely. The shot gun lay near him. Lewis Crain came to witness's house shortly after the shooting to get

defendant's horse, which, though tied in the bushes a few yards in front of witness's yard, the witness had not yet seen. Witness told Crain she wanted him to go for a doctor. Crain said he would go for the doctor if he could get defendant's horse, and get him, defendant, away from his house. He then took the defendant's horse away. James Cox died from the effects of the wound inflicted by the defendant within an hour after he was shot.

Cross examined, the witness said that when she took up the gun in the house, she told defendant that she would shoot the top of his head off if he did not leave, and when she took up the axe she told him she would split his head open if he did not leave. On his arrival at the house defendant said that he came there to talk, but he did not say with whom he wanted to talk. Witness did not testify before the coroner's inquest that defendant, when he reached the house, said that he came to talk with his wife. If her testimony is so stated in the record of the inquest, the transcription is wrong,—she said no such thing. Witness thought the shot gun she had was loaded, but could not say whether with buck shot or small shot. The witness denied that, on the morning of February 25, she directed the deceased to load each barrel of the shot gun with twelve buck shot, and shoot the defendant if he came upon her premises; nor did she say, two hours before the shooting, at her house, in the presence of defendant's wife, and of deceased and W. L. Cox, that she had so ordered and directed the deceased. Defendant did not shoot until after the shot was fired from behind the witness, at which time witness held the axe in her hands, in a striking position. Defendant's wife left witness's house a day or two after the killing. Witness sent orders to defendant not to enter upon her premises, because she despised him for his treatment of her daughter, his wife. Witness never encouraged a separation between the defendant and his wife prior to Christmas, 1885. Since that time she has been unable to endure him, or his wife for going back to him. Mrs. Garrett and defendant's wife were full sisters, and half sisters to deceased and W. L. Cox. Defendant often carried his Winchester gun about the country, but never brought it to the witness's house except upon the two occasions described. Deceased was about forty years old.

W. L. Cox, the son of Mrs. Cowan, the brother of the deceased, and the half brother of the defendant's wife and Mrs. Garrett, was the next witness for the State. His testimony was almost

circumstantially that of his mother, he being present on both of the occasions testified to by her. He added that he observed the defendant closely when the latter stepped in at the door on February 25, the day of the killing, and saw that he had his gun cocked. and his finger on the trigger, and kept it in that condition until he fired the fatal shot. Just before the deceased fired the shot gun, the defendant threw his gun across his left arm, the muzzle pointing towards the mother of the witness and deceased. The parties at Mrs. Cowan's house were sitting quietly talking when defendant came to the door. They were not talking about the defendant. The witness did not see the shot gun cleaned up that morning. He did not hear his mother tell the deceased on that morning to load it with buck shot. He did not know how the gun was loaded, but knew that it had been used about the place to shoot squirrels, small shot being used. The defendant often brought his Winchester to Mrs. Cowan's house.

Mrs. J. V. Garrett, the half sister of deceased, was the next witness for the State. She testified that she was at the house of her mother (the witness, Mrs. Cowan) on the night of Christmas, 1885, when the defendant came there, and when he afterwards brought his wife to that house. She related the incidents and occurrences of that night circumstantially as her mother did. She was not at her mother's house on the day of the homicide until about the hour that her brother died.

J. V. Garrett testified, for the State, that he went to his father's house on Christmas night, 1885, and from there went with his sisters to a party. He returned to his father's house from the party after midnight, and slept with one of his brothers. After breakfast, on the next day, he went to the house of Mrs. Cowan, where his wife had spent the previous night. En route, he met the defendant, who told him that he had taken his wife back to her mother, and accused the witness of criminal intimacy with his wife. The witness, knowing nothing of what had happened the evening before, expressed astonishment at the defendant's jealousy of his wife, and assured him that he had never been guilty of the imputed improprieties in thought or deed. This was on Friday, the day after Christmas. On Sunday witness and defendant had another private conference, at which the witness again assured defendant that he had never been guilty of improper conduct with his wife. Defendant then asked if witness would swear that he had never copulated with his wife, and witness replied that he would, if by that means he

could satisfy defendant.   Defendant proposed there and then to go before a justice of the peace and have the oath administered. Witness consented readily, but suggested that, it being Sunday, it was not likely that the oath could be administered.   Defendant then proposed, and witness agreed, that they would meet the next day at an appointed place, and go to the justice of the peace, who lived between that point and Llano town, and have the oath administered.   Later in the day, witness saw the defendant and his wife talking together, and that evening they left Mrs. Cowan's together, and went off towards their home. Witness went to the appointed place of meeting on the next morning, waited a short time for defendant, and then went to the town of Llano, passing, but not stopping at, the justice's house.   He saw nothing of the defendant during that day.   The witness declared most solemnly that he had never had criminal relations with the defendant's wife.

Lew i Crain testified, for the State, that the defendant rode by his house shortly after dinner on the twenty-fifth day of February, 1886, going towards Mrs. Cowan's house, which was situated between three and four hundred yards distant.   About thirty minutes later witness heard two gun shots fired in the direction of Mrs. Cowan's house.   There was a very slight interval between the two reports.   The first had a deep sound, as though it was the report of a shot gun, and the last a sharp sound like that of a rifle.   Within a few minutes the witness and his wife saw the defendant approaching their house.   Witness's wife being in a delicate condition and knowing the bad state of feeling existing between the defendant and Mrs. Cowan, and fearing that something serious had happened, and anxious to avoid any excitement which might attend defendant's visit, it was suggested that witness should go into the house and that his wife should meet defendant at the door and report the witness absent from home.   That arrangement was carried out, but it had no effect upon the defendant, who came up to the house in a trot, very much excited, and passed by witness's wife into the house.   Witness, observing the miscarriage of the plan to avoid the presence of the defendant, stepped from his hiding place, when defendant told him what had happened, and asked him to go to Mrs. Cowan's for his horse.   In order to get rid of the defendant the witness consented.   Arriving at Mrs. Cowan's witness found James Cox lying in the yard near the house door, bleeding freely.   Witness told Mrs. Cowan he had come for the

defendant's horse. Mrs. Cowan said that she wanted witness to go for a doctor. Witness replied that if he could get the horse, and get defendant away from his house, he would go for a doctor. Witness got the horse from where he was hitched between the road and fence and took it to defendant, who rode off towards Dan Smith's. Witness then went for the doctor and started back with him. About half way, they heard of the deceased's death, and the doctor turned back.

Daniel Smith testified for the State, that he heard the two shots fired at Mrs. Cowan's, on the evening of February 25, 1886. An interval of, perhaps, five seconds divided the reports. The first had the deep sound of a shot gun ; the last the sharp, keen sound of a rifle. About thirty minutes later defendant came riding in a trot from the direction of Crain's house to witness's house. He told witness to go to Mrs. Cowan's and tell his wife that he wanted to see her and make friends. He told the witness what had occurred. Witness declined the mission because he and Mrs. Cowan's family were on unfriendly terms.

Alonzo Cowan, colored, testified for the State that late in January or early in February, 1886, Mrs. Cowan told him to tell the defendant not to come to her house again, and not to put his foot upon her premises. The witness, a few days afterwards (and before the killing), met the defendant and delivered Mrs. Cowan's message. Defendant said that he was ashamed of what he had done. Witness replied that he was ashamed for him. The State closed.

Mrs. Tow, the wife of the defendant, was his first witness. She testified that she was at the house of her mother on the fatal day, and saw the whole of the difficulty which resulted in the death of James Cox. The inmates of Mrs. Cowan's house were sitting by the fire when the defendant came to the door. Mrs. Cowan was sewing. The defendant had his gun in his hand, the barrel hanging down by his side. Witness did not see that his gun was cocked. Defendant stopped at the door, said : "Good evening," smiled, and remarked that he had come to see witness, and requested witness to step outside, as he wanted to talk to her. Mrs. Cowan told him not to come in, but to get off her premises, and that if he did not do so she would shoot the top of his head off. Mrs. Cowan then went to the gun rack, secured a shot gun, and advanced upon defendant, ordering him to leave. Defendant commenced backing towards the wood pile. Mrs. Cowan put the shot gun away somehow, and followed the

defendant out of the house, waving her hands and ordering the defendant to leave. Defendant continued to back, protesting that he had only come to see his wife. Mrs. Cowan continued to advance until she reached the wood pile, where she secured an axe, which, at the distance of six feet from defendant, she held with both hands in a striking attitude, telling him that she would split his head open if he did not leave her place. The defendant waved his gun, evidently to keep Mrs. Cowan from reaching him with the axe. He did not stop at the wood pile. He did not tell Mrs. Cowan to go back, and that she could not scare him. Defendant continued to back until he got fifteen or twenty feet beyond the wood pile, when a gun was fired from behind the witness. Defendant stumbled over some low brush, witness turned and saw a shot gun in James Cox's hands, and that moment a gun fired from the direction of the defendant. James Cox exclaimed that he was shot, and died about an hour later.

The witness denied that the defendant ever choked or threatened to kill her, in order to extort her confession that she had been criminally intimate with Mr. Garrett. Defendant was unreasonably jealous of the witness, and often accused her of criminal relations with other men, Garrett in particular. On Christmas day, 1885, and during the early part of that night, defendant again rang the charges of infidelity against witness until she became angry, and, to tease him, she told him that she had been intimate with Garrett. Defendant then left the house, taking his gun, and returned after midnight and took witness to the house of her mother, Mrs. Cowan, arriving there just before day. Witness took her baby with her, and defendant took his gun. Arriving at Mrs. Cowan's, witness found Mrs. Cowan, her, witness's, sister, Mr. Garrett and her two half brothers, James and W. L. Cox. On the following Sunday, defendant came to Mrs. Cowan's house, and he and witness had a talk together in the yard, and went home together, the witness taking her baby. They lived together as man and wife until shortly before the fatal difficulty. On February 26, 1886, the day after the killing, he took witness home on his horse, since when they have continued to live together as man and wife. When sent to her mother's house the last time, just before the killing, the witness did not take her baby, which was still a suckling. It was sent to the house of the defendant's mother. Witness's breast soon began to pain her, and she sent two friends to her husband be-

fore she would go to nurse her baby. In asking those two friends to go to her husband, the witness did not tell them that she was afraid of violence or death at the hands of her husband.

At this point the State introduced in evidence the record of the testimony of Mrs. Cowan and Mrs. Tow, given before the coroner's inquest. Mrs. Cowan's testimony before the coroner related only to the transaction at her house on the day of the killing and at the time of the killing. The only material difference between this written statement and Mrs. Cowan's testimony on this trial was that she testified before the coroner that when defendant stepped up to her door, he called to his wife and said that he wanted to talk to her.

Mrs. Tow's statement before the coroner and her testimony on this trial differed materially in one respect. To the coroner she stated that when the defendant had backed to the wood pile, he stopped, waved his gun at Mrs. Cowan, the muzzle towards her, and ordered her to stop, as she could not scare him. Mrs. Cowan then picked up the axe and defendant backed off, shaking the gun, muzzle forward, at Mrs. Cowan.

Justice of the Peace Morris, who held the inquest, testified, for the State, that, in reducing to writing the statements of th witnesses examined in that proceeding, extraordinary care was observed to get the substance of the various statements correct. The written document contains the substance of the testimony of Mrs. Cowan and Mrs. Tow. Mrs. Cowan said distinctly, on the inquest, that when defendant came to her house on the fatal day he came to see and talk to his wife.

Mrs. Cowan, recalled by the State, testified that defendant was violent and abusive to the deceased several different times before the killing. A year or two prior to the killing defendant seized deceased by the hair, dragged him about, and abused him considerably.

The motion for new trial raised the questions discussed in the opinion.

*Miller & Dalrymple,* and *Fisher & Townes,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. Mrs. Cowan, who testified on behalf of the State, was the most material witness for the State. She

was not only a witness in the case, but she was an important actor in the transaction which resulted in the death of her son, for the murder of whom defendant was being tried. After she had testified on the trial the defendant offered to prove that about two hours before the homicide, she said that she made her son, James Cox (the deceased), clean up the shot gun and load it with twelve buck shot in each barrel, and told him if defendant came on her premises to kill him. This proposed evidence, upon objection made thereto by the State, was rejected. This ruling of the court was erroneous. If for no other purpose the offered evidence was competent to disclose the unfriendly state of the witness's feelings towards the defendant, and the malignant character of such feeling. It is always competent to show the *animus*, the state of feeling of the witness toward the party against whom such witness testifies, and in such examination great latitude is allowed. (Watts v. The State, 18 Texas, Ct. App., 381.)

But we think this proposed evidence was pertinent, and material to the defendant, in a still more important respect, that is, to show an understanding, agreement and intent on the part of Mrs. Cowan and the deceased to kill the defendant in the event he came upon the premises, and to show that they made preparation accordingly, by loading the shot gun with buck shot. This evidence would have tended to show that in the attack made by Mrs. Cowan upon the defendant, she was joined and aided by the deceased, and that in fact the attack was preconcerted and jointly made by Mrs. Cowan and deceased. If the jury had been satisfied from evidence that such was the character of the attack made upon defendant; that, while Mrs. Cowan was pursuing the defendant with an axe, the deceased was preparing to shoot him with a gun, and did discharge one barrel of a double barreled shot gun loaded with buck shot at him, it is reasonable to suppose that the defendant's plea of self defense would have been more favorably considered than if the jury had believed, as from the evidence adduced they were warranted in believing, that the attack upon the defendant was made by Mrs. Cowan alone, and the deceased shot at defendant, with no unlawful intent, but for the purpose only of protecting his mother from a threatened attack upon her by the defendant, and that the gun so fired was not loaded with buck shot, but with small shot. We must hold, therefore, that the proposed evidence was not only admissible, but that it was material to the defendant, and that

the rejection of it was error for which the conviction must be set aside.

II. Several objections are urged to the charge of the court. One material defect in the charge is the omission to instruct the jury in the law of manslaughter. We think the peculiar facts of the case entitled the defendant to such instructions. While the jury were not satisfied that defendant's plea of self defense was sustained, considering perhaps that defendant provoked the contest by going to the house of Mrs. Cowan, where he had been forbidden to go; still, if they had believed from the evidence that he went to said house with no intention to kill any one, or to inflict serious bodily harm upon any one, but merely to see and talk with his wife, who was at said house, they should have been authorized by the charge to inquire whether the homicide was committed by him without malice, voluntarily and under the immediate influence of sudden passion produced by an adequate cause. We think the evidence fairly raises the issue of manslaughter, and that it was material error to not give the law of that grade of homicide in charge to the jury. (McLaughlin v. The State, 10 Texas Ct. App., 340; Neyland v. The State, 13 Texas Ct. App., 533; Moore v. The State, 15 Texas Ct. App., 1; Hobbs v. The State, 16 Texas Ct. App., 517; Jones v. The State, 17 Texas Ct. App., 602.) The charge was excepted to at the time of the trial because of this defect.

As to other objections made to the charge, we are unable to perceive their soundness; nor do we think that there was error in refusing the special charges requested by the defendant.

Because of the errors we have discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*